In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-3614

SCOTT SORNBERGER and TERESA
SORNBERGER, individually and on
behalf of their children, CLAUDE
SHINALL and KAYLA BOWDEN,

*Plaintiffs-Appellants*,

*v.*

CITY OF KNOXVILLE, ILLINOIS, CITY
OF GALESBURG, RICK PESCI, et al.,

*Defendants-Appellees*.

_____

Appeal from the United States District Court
for the Central District of Illinois.
No. 02 C 1224—**Joe Billy McDade**, *Judge.*

_____

ARGUED SEPTEMBER 23, 2005—DECIDED JANUARY 20, 2006

_____


Before, POSNER, RIPPLE and ROVNER, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Scott Sornberger ("Scott") and his
wife Teresa Sornberger ("Teresa")[1] spent approximately
four months in jail while awaiting trial for their suspected

_____

[1] We refer to the parties by their first names when necessary to
avoid ambiguity.

involvement in the January 12, 2000 robbery of the First Midwest Bank ("First Bank"). Eventually, a man admitting to be the true bank robber came forward, and the Sornbergers were released. They then brought this federal civil rights action, *see* 42 U.S.C. § 1983, against Rick Pesci, the Knoxville, Illinois chief of police, the City of Galesburg, Illinois and several Galesburg police officers. The complaint alleged that the Sornbergers had been arrested without probable cause in violation of the Fourth Amendment, that Teresa had been coerced into confessing in violation of her Fifth and Fourteenth Amendment rights, and that the defendants unlawfully had concealed evidence. The Sornbergers also brought claims on behalf of their children for intentional infliction of emotional distress.

At the close of discovery, the defendants moved for summary judgment. Teresa cross-moved for partial summary judgment on her false arrest claim against Galesburg police officer Dennis Sheppard. The district court granted in full the defendants' motion for summary judgment, and correspondingly denied Teresa's motion for partial summary judgment. The Sornbergers appealed. For the reasons set forth in the following opinion, we affirm the judgment of the district court with respect to the Sornbergers' concealment of evidence claim and the children's claims for intentional infliction of emotional distress. With respect to Scott's claim for unlawful arrest, we affirm the district court's determination that Officers Sheppard and Riley cannot be found liable, but we reverse the entry of summary judgment in favor of Chief Pesci and Officer Clauge. Regarding Teresa's claim for false arrest, we affirm the determination of the district court that neither Chief Pesci nor Officer Clauge may be held liable, but we reverse and remand with respect to Officers Sheppard and Riley. On Teresa's claims related to her involuntary confession, we

reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion. We also reverse and remand the district court's determination that Galesburg could not be found liable on a theory of municipal liability for Teresa's claims.

# I

# BACKGROUND

## A. Facts

On January 12, 2000, First Bank was robbed by a perpetrator wearing a baseball cap. Only two First Bank employees got a first-hand look at the robber, and only Tracy Clevenger, the teller who handed money to the robber, caught a glimpse of the robber's face. Clevenger described the perpetrator as male, 5'9", approximately 160 pounds, dark complected, dark eyes, dark hair, clean shaven and in his thirties. Knoxville, Illinois Chief of Police Rick Pesci was the first law enforcement official to arrive at the scene. He took the robber's description from Clevenger and called the FBI to assist in the investigation.

Initially, no eyewitness nor any other First Bank employee was able to identify the robber. Shortly after the robbery, however, as three First Bank employees began reviewing bank surveillance video, Brent Dugan, a First Bank employee, remarked that the robber "looked like" Scott Sornberger, who was an acquaintance of Dugan and a former customer of First Bank. First Bank employees Diane Carter and Roger Schultz agreed that the perpetrator captured on video bore some likeness to Scott. After watching the same footage from a different angle, however, Dugan remarked that he was less sure of the likeness. Chief Pesci, who was present intermittently while the employ-

ees viewed the surveillance tapes, heard at least one of these comments on the resemblance of the robber to Scott.

Acting on this information, Chief Pesci proceeded to question the First Bank employees about Scott Sornberger. Chief Pesci learned that Scott and Teresa had been customers of First Bank, but that their account had been closed because of a zero or negative account balance. That evening, Chief Pesci sent Knoxville police officers to Scott's workplace to bring him to the police station for questioning. When the police found Scott, he stood 5'11", had blond hair, blue eyes, a fair complexion and a mustache. Despite the discrepancies between Scott's appearance and the description of the bank robber, the police proceeded to question Scott at the station house. They learned that the Sornbergers had experienced recent financial difficulties. Scott also told the officers that he had placed a call to Consumer Credit Counseling earlier in the day. The same evening, Knoxville officers brought Teresa to the police station for questioning. They interviewed her outside of Scott's presence. In the course of questioning, both Sornbergers offered consistent alibis: They were together at Scott's parents' home, using his parents' computer when the robbery occurred.

To assist in the robbery investigation, Chief Pesci obtained the services of City of Galesburg police officers Dennis Sheppard, Anthony Riley and David Clauge. All of these officers are named as defendants in this action. The day after the robbery, Officer Clauge brought still photographs from the bank's surveillance cameras along with digital photos of Scott to show Illinois State's Attorney Paul Mangieri. Mangieri declined to seek an arrest warrant for Scott, but successfully obtained a search warrant for the computer in Scott's parents' house to allow Officer Clauge to confirm Scott's alibi. Later that day, Officer

Clauge met again with Mangieri, this time accompanied by Chief Pesci and FBI agent Jeff Jackson. Officer Clauge expressed to Mangieri his belief that the pictures of Scott presented a close match to the ones taken of the robber by the bank surveillance cameras. At the same meeting, Chief Pesci told Mangieri about the Sornbergers' financial problems and their closed account at First Bank. On the information provided by Clauge and Pesci, Mangieri told the officers that they had probable cause to arrest Scott for armed robbery. The officers decided to make the arrest during the execution of the search warrant for Scott's parents' computer. The officers also decided that Officers Sheppard and Riley would re-interview Teresa if she could be found at Scott's parents' home.

The day after the robbery, when Chief Pesci and Officers Clauge, Riley and Sheppard arrived at Scott's parents' house to execute the search warrant, only Teresa was present. The parties dispute whether the officers requested or instructed Teresa to accompany them to the Galesburg police station for questioning. In either case, she complied and was transported to Galesburg in the front seat of a police car, unrestrained by handcuffs. Chief Pesci stayed behind at Scott's parents' home and arrested Scott when he returned.

After Officers Sheppard and Riley arrived at the Galesburg Public Safety Building with Teresa, they conducted her to an interview room and began to question her. This interview resulted in a verbal and eventually a written confession from Teresa in which she admitted that she had assisted her husband in robbing First Bank. Although the existence of the statement is undisputed, exactly what occurred during Teresa's interview is the subject of intense dispute between the parties. According to Teresa, she was

told immediately after arriving in Galesburg that she was a suspect in the robbery. Teresa claims that she was then psychologically coerced into confessing by Officer Sheppard who allegedly (1) falsely informed her that witnesses placed her at the scene of the robbery; (2) "repeatedly told her to think about her kids"; (3) "yelled at her and accused her of lying"; (4) falsely promised her that, if she implicated her husband, she would not be charged with any crime; (5) "threatened to call the [D]epartment of Children and Family [S]ervices" ("DCFS") to take her children away if she continued to maintain her innocence; and (6) "[r]efused to honor her request to speak with an attorney." R.122 ¶ 30. Teresa also maintains that she did not receive *Miranda* warnings until asked to repeat her oral confession to the Galesburg police stenographer.

According to the defendants' version, Teresa required little prodding before she voluntarily began to "tell her 'story.'" R.110 ¶ 33. The officers claim that they told Teresa that they believed that Scott had committed the robbery, asked Teresa about a witness who had seen Teresa at the bank on the day of the robbery and implored Teresa to tell the truth and to think of her children rather than protecting Scott. The defendants also maintain that Officer Sheppard advised Teresa of her *Miranda* rights before she orally confessed to the robbery.

After hearing Teresa confess, Officer Sheppard brought Chief Pesci into the interrogation room and asked Teresa to repeat her statement. She resisted, and the officers again suggested that she think of her children; this time, they admittedly made threats to call DCFS. The officers then presented Teresa with a transcribed version of her confession and asked her to sign it. Teresa complied.

Criminal proceedings were instituted against the Sornbergers for bank robbery by the State of Illinois. Teresa's confession was offered into evidence to support the charges against both her and Scott. Teresa brought a pretrial motion to suppress her confession, but the Knox County Court denied the motion after a two-day hearing. Crediting the officers' testimony and finding no due process or self-incrimination violation, the Knox County Court offered the following rationale:

> Here, I think there is no question, the credibility of the defendant is—has been attacked successfully. . . . She had to be lying at one time or another, and she admits it here on the witness stand. . . . I have a tainted—clearly having told lies to police authorities and people in positions of authority in the past—type of defendant here. I have no attack successful or not on the police.

R.111, Ex.15 at 52-62.

While the Sornbergers were imprisoned awaiting trial, a man named Philip Pitcher committed a string of bank robberies in Illinois and Indiana. Pitcher resembled Scott Sornberger, prompting State's Attorney Mangieri to ask the FBI to conduct a more detailed comparison of Scott's facial features to the images taken by First Bank's surveillance equipment. The FBI compared Scott's ear to the ear of the perpetrator as pictured in the bank's surveillance photographs. The FBI comparison turned up physical differences between Scott and the bank robber that eliminated Scott as a suspect. Charges against the Sornbergers were dropped, and they were released from jail.

## II

## DISCUSSION

### A. Standard of Review

We review the district court's grant of summary judgment de novo. *Upton v. Thompson*, 930 F.2d 1209, 1211 (7th Cir. 1991). In doing so, we must construe all facts and reasonable inferences in the light most favorable to the Sornbergers, the non-moving parties. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)*; Chortek v. City of Milwaukee*, 356 F.3d 740, 745 (7th Cir. 2004). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### B. The Sornbergers' Arrests

With respect to the Sornbergers' claims for unlawful arrest, the defendants have invoked the defense of qualified immunity. We shall first set forth the legal framework and then address each arrest.

Government officials performing discretionary functions enjoy qualified immunity from suit to the extent that their conduct "could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987); *Leaf v. Shelnutt*, 400 F.3d 1070, 1079 (7th Cir. 2005). Because qualified immunity protects the defendant not only from liability but also from the burdens of standing trial, courts should determine early in the proceedings whether qualified

immunity exists. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). To determine whether defendants are entitled to this defense, we follow a two-step analysis. We first ask whether the plaintiff has asserted the violation of a federal constitutional right. *Id.* at 200; *Leaf*, 400 F.3d at 1080. If such a violation did occur, we then determine whether the right was so clearly established at the time of the alleged violation that a reasonable officer would know that his actions were unconstitutional. *Saucier*, 533 U.S. at 202; *Anderson*, 483 U.S. at 640.

The constitutional right to be free from arrest without probable cause indisputably was established at the time Scott and Teresa were arrested. *See, e.g., Beck v. Ohio*, 379 U.S. 89, 91 (1964) ("Whether [the defendant's] arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it . . . ."). It does not follow, however, that any arrest made without probable cause necessarily deprives the officers of qualified immunity. The Supreme Court has recognized "that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and . . . in such cases those officials—like other officials who act in ways they reasonably believe to be lawful— should not be held personally liable." *Anderson*, 483 U.S. at 641. Instead, the relevant question is whether "a reasonable officer could have believed that probable cause existed" to make the arrest. *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (holding that officers are protected by qualified immunity where they possessed trustworthy, but ultimately incorrect evidence, that a suspect planned to assassinate the President). In this manner, the doctrine of qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the

law." *Id.* at 229 (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986)) (internal quotation marks omitted).

### 1.  Scott's Arrest

Scott contends that his arresting officers unreasonably concluded that probable cause supported his arrest. Probable cause is a practical, common-sense determination. *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993). The police ordinarily have probable cause when "the facts and circumstances within their knowledge and of which they [have] reasonably trustworthy information [are] sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense." *Beck*, 379 U.S. at 91. The question of probable cause is typically "a proper issue for a jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Maxwell*, 998 F.2d at 434.

The district court decided, as an initial matter, that Officers Clauge, Sheppard and Riley could be not be found liable for Scott's arrest because Chief Pesci was the only arresting officer. As to Chief Pesci, the court concluded that probable cause in the form of eyewitness testimony, surveillance footage, and motive supported Scott's arrest and absolved Pesci of any liability. The district court therefore awarded the defendants summary judgment, concluding that no reasonable juror could find that the officers lacked probable cause to arrest Scott. In the court's view, the following "undisputed facts" armed the officers with probable cause for Scott's arrest: "(1) an individual familiar with Scott positively identified him as bearing a strong resemblance to the robber; (2) pictures of Scott taken the previous evening at the Galesburg police station objectively

resembled, to a high degree of certainty, still shots from the surveillance camera; and (3) an admitted motive—financial problems." R.144 at 18.

We respectfully disagree with the district court's view as to whether probable cause existed as a matter of law. Arrayed against the indicators supporting probable cause are other factors that weigh heavily against a determination that Scott was the bank robber. First, Scott did not match—or even come close to matching—the physical description of the robber that was provided by the only eyewitness who saw the robber's face. Secondly, Brent Dugin, the bank employee who knew Scott, told the police that, at certain angles of the surveillance footage, the suspect did not resemble Scott. *See id.* at 3. Third, the camera footage itself lacked a clarity of resolution that made it difficult to discern significant detail. The inconclusive nature of this footage, in addition to the differences between the specific description of the bank robber and the actual appearance of Scott Sornberger, undermines substantially the determination of probable cause in this instance. Notably, all of these factors were known to the officers who arrested Scott. Considering these facts, a reasonable jury certainly could find that probable cause did not exist. Accordingly, a determination of probable cause at the summary judgment stage was improper.

The defendants contend that we nevertheless must affirm the district court because Scott's arresting officers enjoyed qualified immunity. As they correctly point out, the qualified immunity issue—whether a reasonable officer could have believed that he had probable cause— is usually decided by the court before trial. *Hunter,* 502 U.S. at 228. Moreover, we recognize that, even if probable cause is lacking with respect to an arrest, the arresting officer is entitled to immunity so long as his belief that

he had probable cause was objectively reasonable. *See id.* at 227; *Edwards v. Cabrera*, 58 F.3d 290, 293 (7th Cir. 1995). However, the qualified immunity doctrine does not protect those who act unreasonably or "who knowingly violate the law." *Hunter*, 502 U.S. at 228. Qualified immunity is, as the term implies, qualified. It contemplates instances in which a public official's actions are not protected because the official knew or should have known he was violating an individual's constitutional rights. *See Butz v. Economou*, 438 U.S. 478, 506-07 (1978) ("[I]t is not unfair to hold liable the official who knows or should know he is acting outside the law, and that insisting on an awareness of clearly established constitutional limits will not unduly interfere with the exercise of official judgment.").

The present record does not necessarily support a conclusion that Scott's arresting officers decided, in an objectively reasonable fashion, that they had probable cause to arrest Scott. As we described in our analysis of probable cause, the evidence implicating Scott in the robbery was exceedingly thin. Scott bore a generic resemblance to the individual captured on grainy surveillance video and had admittedly poor finances. The bank employee who had noticed a resemblance later modified that conclusion in the presence of Chief Pesci.[2] Scott's physical appearance was inconsis

---

[2] The parties disagree as to whether Chief Pesci actually heard the bank employee, Brent Dugan, make this later statement. According to the deposition of Dugan, after seeing the video from a different angle, which occurred within "a minute or two" of viewing the footage from the original angle, he commented that the view from the second angle did not resemble Scott. R.122, Ex.23 at 39. Chief Pesci, although never asked whether he heard Dugan's second comment, testified to having been pres-

(continued...)

tent with the eyewitness description of the bank robber in almost every material respect. Nevertheless, federal and state prosecutors were approached for an authorization to arrest Scott. *See* R.136, Tab 7 at 47-48. The United States Attorney, when approached by the FBI, refused to sanction Scott's arrest, citing the need for further investigation.[3] Undeterred, Officer Clauge and Chief Pesci then consulted state's attorney Mangieri for his opinion on whether there was probable cause to arrest Scott. The information that the

---

[2] (...continued)
ent while he and Dugan reviewed the surveillance footage "several" consecutive times. R.136, Tab 1 at 77-80. A reasonable inference from this testimony (and we must, in this procedural context, draw all inferences in favor of Scott) is that Chief Pesci heard both of Dugan's statements.

[3] FBI agent Brian Sharkey, who was assisting in the investigation of the First Bank robbery, testified at his deposition that he consulted Assistant United States Attorney Dara Lynn Kanauss regarding whether she wished to arrest Scott on federal charges. She declined to authorize Scott's arrest. Agent Sharkey then rejoined the Galesburg officers to inform them of the federal prosecutor's decision. This is how he described the ensuing conversation:

> Basically, I told them that I told—that I had told Dara Lynn that I felt that there were a few leads that I wanted to track down further before we did any—before we filed any charges. She agreed. She thought that we should—we didn't at that point, I didn't feel that this guy was a risk of flight or that he was going to leave the area, speaking of Mr. Sornberger. And so we thought that we had time to maybe track down a few leads, so we were going to—she said that she was in agreement with me to do that.

R.136, Tab 6 at 55.

officers presented to Mangieri, however, as far as the record reveals, appears to have been incomplete and one-sided. Officer Clauge told Mangieri that Scott was a suspect "based upon a generalized description of [the] bank robber," that Scott had poor finances, and that one bank employee had remarked that Scott resembled the perpetrator caught on tape. R.122, Ex.29 at 32-33. Mangieri was also informed of the Sornbergers' alibi, and that a neighbor had seen an individual running behind the Sornbergers' home near the time that the robbery was committed. Mangieri was then shown still-frame photographs from the surveillance video to compare with photos taken of Scott. Officer Clauge, however, apparently did not reveal the additional facts that undermined the likelihood that Scott was the perpetrator. From the record before us, it appears that Mangieri was not told that the one actual eyewitness to the crime gave a description that did not match Scott's physical appearance. He apparently was not told that the bank employee who originally had opined that Scott resembled the perpetrator on the tape later modified that opinion. He was not shown the actual tape. In short, the record is susceptible to the reading that, having heard what the officers wanted him to hear—and no more—Mangieri opined that probable cause existed for Scott's arrest.[4]

---

[4] In describing the set of information that the officers presented to him, state's attorney Mangieri gave the following account:

> The information that I had is that they had developed an investigatory lead based upon a generalized description of this bank robber, the viewing of the surveillance tape, one of the bank employees says, ["]It looks like Scott Sornberger,["] and then an initial interview of Scott Sornberger and where he was during the time in question, and some additional
> (continued...)

This record cannot establish that Officer Clauge and Chief Pesci simply made a good-faith mistake as to the existence of probable cause. We have held that, when an officer presents his case in good-faith to a prosecutor and seeks that official's advice about the existence of probable cause, his subsequent action, based on the prosecutor's advice that probable cause exists, is powerful evidence that the officer's reliance was in good faith and deserving of qualified immunity. *See Kijonka v. Seitzinger*, 363 F.3d 645, 648 (7th Cir. 2004). Here, however, the record, as it comes to us, hardly establishes such a good-faith seeking of legal advice. Rather, the record is susceptible to the view that the officers themselves realized the weakness of their case, and therefore manipulated the available evidence to mislead the state prosecutor into authorizing Scott's arrest.[5] This conduct, as alleged, creates serious factual issues as to whether the officers reasonably relied on the prosecutor's advice. On this

---

[4] (...continued)
  information from—that was called in from citizens of Knoxville that law enforcement had received.

R.136, Tab 5 at 32-33.

[5] These circumstances are similar in principle to our cases that deny qualified immunity to officers who deliberately misrepresent or omit facts in a warrant affidavit. In those cases, officers will be held to have knowingly violated a plaintiff's fourth amendment rights if those officers, in the course of obtaining a warrant, "had obvious reasons to doubt the accuracy of the information [they] reported, or failed to inform the judicial officer of facts they knew would negate probable cause." *Beauchamp v. City of Noblesville*, 320 F.3d 733, 743 (7th Cir. 2003); *Neiman v. Keane*, 232 F.3d 577, 580 (7th Cir. 2000); *cf. Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).

record, neither Chief Pesci nor Officer Clauge can be entitled to qualified immunity.[6]

"A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest." *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986). As we have held, "[r]easonable avenues of investigation must be pursued" especially when, as here, it is unclear who committed the crime. *Id.* In the present case, the officers had obtained a warrant for the search of the Sornbergers' parents' computer, which would have allowed the investigators to confirm the couple's alibi. Rather than waiting to obtain this critical information, the officers arrested Scott while the search of his parents' home was taking place. On this record, given that the lynchpin of a probable cause determination was on the verge of being obtained, the officers' arrest of Scott before reviewing the results of the computer search appears to have been unreasonably premature.

### 2. Teresa's Arrest

Teresa's arrest presents a somewhat different situation. The parties agree that no probable cause existed to arrest Teresa until after she confessed to her involvement in the

---

[6] Officers Sheppard and Riley, by contrast, may not be found liable for Scott's arrest. There is nothing in the record to suggest that either of these officers were present at the meeting with state's attorney Mangieri. Nor were the officers involved in the actual arrest of Scott. They therefore lacked both the knowledge of a false arrest and the opportunity to intervene. *See Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). Accordingly, we must affirm the district court's determination that neither of these officers could be held liable for Scott's arrest.

bank robbery. Instead, the parties dispute whether Teresa actually was arrested before she confessed. Teresa contends that, when Officers Sheppard and Riley detained her at Scott's parents' home and subsequently transported her to the Galesburg police station, she was arrested without probable cause in violation of the Fourth Amendment. The defendants take the view that Teresa was not arrested prior to her confession, and, therefore, probable cause was not required.

The district court agreed with the officers, rejecting Teresa's claim that her arrest occurred when she was transported from Scott's parents' home to the Galesburg police station. The court concluded that "Teresa was not 'seized' within the meaning of the Fourth Amendment at any time at issue until she confessed, at which time probable cause existed" to arrest her. R.144 at 27. The court also determined that Teresa voluntarily consented to accompany Officers Sheppard and Riley to Galesburg. Alternatively, the court held that Officers Sheppard and Riley would be protected by qualified immunity because a reasonable officer in their position would not have been on notice that his conduct violated clearly established law. The court also held that neither Officer Clauge nor Chief Pesci could be liable for Teresa's arrest. The two officers had no role in Teresa's transportation to the Galesburg police station. According to the court, they became involved in Teresa's detention only after she had confessed, at which point probable cause supported a lawful arrest.

### a. defendants Sheppard and Riley

An arrest occurs when "a reasonable person in the suspect's position would have understood the situation to

constitute a restraint on freedom of movement of the degree
which the law associates with formal arrest." *United States
v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999) (internal quotation
marks omitted). As the Supreme Court has explained:

> There is no doubt that at some point in the investigative
> process, police procedures can qualitatively and quanti-
> tatively be so intrusive with respect to a suspect's
> freedom of movement and privacy interests as to trigger
> the full protection of the Fourth and Fourteenth Amend-
> ments. And our view continues to be that the line is
> crossed when the police, without probable cause or a
> warrant, forcibly remove a person from his home or
> other place in which he is entitled to be and transport
> him to the police station, where he is detained, although
> briefly, for investigative purposes. We adhere to the
> view that such seizures, at least where not under
> judicial supervision, are sufficiently like arrests to
> invoke the traditional rule that arrests may constitution-
> ally be made only on probable cause.

*Hayes v. Florida*, 470 U.S. 811, 815-16 (1985) (citations
omitted).

Here, a key factual dispute exists as to whether Officer
Sheppard told Teresa that she "needed" to accompany him
to the Galesburg police station or whether she went volun-
tarily. We do not believe that the district court should have
resolved this factual issue in favor of Officer Sheppard.
Although Teresa responded "Yeah" when asked at a
deposition whether she voluntarily left with the officers,
Officer Sheppard also admitted that he may have told
Teresa that she "needed" to accompany him. Appellants' Br.
at 40. Resolving inferences in favor of Teresa, as is required
at this stage, a reasonable juror could indeed find that a

person in Teresa's position would believe, based on Officer Sheppard's need-to-go statement, that she was under arrest.[7] *See Gardenhire v. Schubert*, 205 F.3d 303, 314 (6th Cir. 2000) ("A police officer's statement that 'you need to go' somewhere carries substantial authoritative weight. We think very few people could hear such a directive from a police officer and still think they were free to act otherwise. Once the police removed the [defendants] from their home to the police station, the encounter took on an arrest-like nature.") (citing *Hayes*, 470 U.S. at 816).[8]

Apart from Teresa's alleged willingness to accompany the officers, the district court based its finding that no arrest occurred primarily on the lack of any threat of force by the officers. However, physical force is not the hallmark of an arrest. *See Dunaway v. New York*, 442 U.S. 200, 212 (1979). The pertinent facts in *Dunaway* that led to a finding of arrest were "that (1) the defendant was taken from a private dwelling; (2) he was transported unwillingly to the police station; and (3) he was subjected to custodial interrogation resulting in a confession." *United States v. Sharpe*, 470 U.S. 675, 684 n.4 (1985) (discussing *Dunaway*, 442 U.S. at 212). Resolving inferences in favor of Teresa, we conclude that the circumstances of her arrest implicate all three *Dunaway* factors.

---

[7] Ascertaining the reasonableness of the suspect's belief that she is under arrest is typically a question of fact for the jury. *See Posr v. Doherty*, 944 F.2d 91, 99 (2d Cir. 1991).

[8] The existence of a triable issue with respect to whether Officers Sheppard and Riley requested or demanded that Teresa accompany him also precludes summary judgment on the district court's alternative holding that Teresa consented to her seizure.

The district court also relied on Teresa's deposition testimony that "reveals that she was never accused of a crime, nor considered a suspect in the robbery." R.144 at 36. This characterization ignores, however, Teresa's deposition statement that Officer Sheppard told her she was suspected of a crime prior to her confession. *Id.* Second, the district court's conclusion relied on inferences improperly drawn from the fact that Sheppard's questions to Teresa focused on Scott's involvement in the robbery. According to the district court, "Sheppard and Riley's questioning indicated their belief that [Teresa] had some knowledge about the robbery because they believed that Scott was the perpetrator, but that there is no indication that either Sheppard or Riley suspected Teresa of participation." *Id.* This conclusion resolved facts in the defendants' favor that easily could produce opposite inferences in light of Teresa's testimony that Officer Sheppard (1) had questioned her about *her* whereabouts during the robbery, and (2) had informed her that witnesses placed her around the bank. Both factors would permit a reasonable person to conclude that she was suspected of a crime.

Finally, the district court concluded that Teresa did not become a suspect until she verbally confessed. Yet, at the hearing on the motion to suppress her confession, the officers claimed that Teresa received her *Miranda* warnings before verbally confessing. The administration of *Miranda* warnings gave clear indication to Teresa that she was considered a suspect and was likely under arrest before probable cause was established. *See United States v. Obasa*, 15 F.3d 603, 608 (6th Cir. 1994) (holding that "[a]lthough giving *Miranda* warnings to a detainee may not automatically convert a *Terry* stop into an arrest, it is evidence that the nature of the detention has grown more serious"). The officers cannot claim, on one hand, that

Teresa's confession was not tainted by a lack of *Miranda* warnings and then argue, on the other, that those same *Miranda* warnings are not evidence that Teresa was considered a suspect. The contradiction creates a triable issue that prevents summary judgment.

We must conclude, therefore, that genuine issues of fact preclude summary judgment on the issue of whether Teresa was under arrest before confessing. There remains a dispute as to: (1) whether Sheppard told Teresa she "needed" to accompany the officers; and (2) whether the officers read Teresa her *Miranda* rights before she confessed. Assuming, as we must in the procedural context in which this case comes to us, that Teresa's version of the events is accurate, it cannot be maintained that a person, after being told she must accompany officers to a police station, then having her *Miranda* rights read to her, would "have thought [she] was sitting in the interview room as a matter of choice, free to change [her] mind and go home to bed." *Kaupp v. Texas*, 538 U.S. 626, 632 (2003).

Those same triable issues also preclude a determination that Officers Sheppard and Riley are entitled to qualified immunity as a matter of law. *See White v. City of Markham*, 310 F.3d 989, 993 (7th Cir. 2002) ("The threshold inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation."). Viewing the disputed facts in a light most favorable to Teresa, a reasonable officer would not have believed that Teresa's detention and interrogation were consensual and that their actions were within the bounds of the Fourth Amendment. Accordingly, the district court erred in concluding that Officers Sheppard and Riley were entitled to qualified immunity.

### b.  defendants Pesci and Clauge

Neither Chief Pesci nor Officer Clauge were directly involved in Teresa's transportation to the Galesburg police station. For liability to attach to an officer's failure to intervene, that officer must have (1) had reason to know that a citizen was unjustifiably arrested, and (2) had a realistic opportunity to intervene to prevent that harm from occurring. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).

Teresa's brief admits that "Clauge, who was Sheppard and Riley's supervisor, emphasized to them that they should request that Ms. Sornberger come to the police station voluntarily and that they should take her from the house only if she agreed." Appellants' Br. at 12. Clauge's instruction cannot be read as authorizing an arrest. He therefore had no reason to know that Teresa would ever be arrested without probable cause. On this record, Chief Pesci had even less involvement in Teresa's arrest and virtually no opportunity to intervene. He had remained outside of Scott's parents' home while the search for the computer was being executed. Chief Pesci's only interaction with Teresa came once Teresa had given her oral confession at the station house, when, as far as Pesci could tell, she was under lawful arrest. The district court therefore properly held that, on the record before it, Chief Pesci and Officer Clauge could not be found liable for Teresa's false arrest.

## C.  Teresa's Confession

The district court held that Teresa was collaterally estopped from bringing a claim based on her confession in this § 1983 action because the Knox County Court had determined, at a suppression hearing in the criminal action,

that her confession was voluntary. The district court held inapplicable the conventional bar on using collateral estoppel when appeal is impossible in the initial proceeding; it reasoned that, because the state court's decision rested on credibility determinations, the decision had little chance of being reversed on appeal. Principles of issue preclusion, therefore, prevented Teresa from relitigating the voluntariness of her confession in this civil suit.

In order to evaluate the correctness of this ruling, we first examine the circumstances surrounding the ruling in the state trial court. At the conclusion of two days of testimony from Teresa and from Officers Riley and Sheppard, the Knox County Circuit Court denied Teresa's motion to suppress her confession. The court noted, as a preliminary matter, that Teresa's suppression motion came down to a question of credibility. Over the two days of testimony, Teresa and the officers had presented dramatically different accounts of what had occurred in the interview room at the Galesburg Public Safety Building. The Knox County Court ultimately refused to credit Teresa's testimony. The court reasoned that, by alleging that her coerced confession was false, Teresa had proved herself untrustworthy, and having lied once, Teresa could not be believed when testifying at the suppression hearing.

Having made this threshold credibility finding, the Knox County Court resolved the *Miranda* issue; it stated simply: "I believe the officers. I do not believe the defendant." R.111, Ex.15 at 55. The more subtle question of whether Teresa's confession was voluntary for purposes of due process gave the court greater difficulty. The court found most troubling the consistent testimony that the officers made certain statements to Teresa regarding her children's future. Nevertheless, the court eventually

found that the statements made before Teresa's initial, verbal confession consisted only of permissible appeals to Teresa's "priorities" and "system of values." *Id.* at 60. In the court's view, the threatening references to Teresa's children being taken away were not made, if at all, until after she had verbally confessed. On the issue of whether the later threats tainted Teresa's written confession, the court stated simply, "I am letting in the written statement because the attack is not sufficient." *Id.* at 62.

### 1. Collateral Estoppel

With this background, we now turn to the ruling of the district court. As we noted earlier, the court determined that the decision of the Knox County Court on Teresa's suppression motion collaterally estopped her from relitigating whether her confession was *Miranda*-infirm or involuntary. The doctrine of collateral estoppel generally bars relitigation of issues that were litigated fully and decided with finality in a previous proceeding. *Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 398 (1981); *Lee v. City of Peoria,* 685 F.2d 196, 199-202 (7th Cir. 1982) (applying Illinois law). Illinois law,[9] however, provides that collateral estoppel is unavailable when: (1) "additional evidence" is discovered after the prior decision; or (2) the party against whom preclusion is sought was unable to appeal the judgment in the initial action. Teresa argues that both exceptions apply to her case and deprive the suppression ruling of preclusive effect. In this case, we believe that the unavailability of an appeal is determinative.

---

[9] Illinois law determines the preclusive effect, if any, of a judgment rendered by an Illinois court. *See* 28 U.S.C. § 1738; *Rekhi v. Wildwood Indus.,* 61 F.3d 1313, 1317 (7th Cir. 1995).

Teresa relies on *People v. Mordican*, 356 N.E.2d 71, 73 (Ill. 1976), in which the Supreme Court of Illinois held that collateral estoppel cannot be asserted against a criminal defendant who "had no opportunity to obtain a review of the correctness of the ruling made in his earlier [proceeding]." In *Mordican*, a criminal defendant was unable to appeal the denial of his motion to suppress evidence in a prior trial because the trial had ended in an acquittal. When the defendant was subsequently tried on a separate criminal charge stemming from the same events, he again sought to suppress the same evidence. The trial court denied the defendant's motion on the grounds that the issue had been adjudicated during the first criminal proceeding. The defendant ultimately was convicted of the charges brought against him at the second trial. On appeal, the Supreme Court of Illinois held that acquittal of a criminal defendant forecloses the application of collateral estoppel in subsequent proceedings. *Id.* at 74. The court reasoned that a defendant who is acquitted has no opportunity to obtain appellate review of rulings made by the trial judge during the course of the trial. *Id.* Because of this "peculiar circumstance," rulings by the trial judge cannot bind an acquitted defendant in later proceedings through the doctrine of collateral estoppel. *Id.* Recent Illinois decisions demonstrate the continued vitality of this rule. *See, e.g., People v. Weilmuenster*, 670 N.E.2d 802, 808-09 (Ill. App. 1996).

Whether *Mordican* applies in the civil context, however, has not yet been decided by Illinois courts. Language in *Mordican* indicates that its holding may indeed be confined to the criminal context. *See id.* ("The extent to which the doctrine of collateral estoppel may be used against a defendant in a criminal case is, of course, severely limited."). Subsequent Illinois cases, however, have hinted in dicta that the *Mordican* rule applies with equal force in the

civil context and bars a civil litigant from using collateral estoppel against a party who had no chance to appeal. *See, e.g.*, *Morris B. Chapman & Assocs., Ltd. v. Kitzman*, 739 N.E.2d 1263 (Ill. 2000) (applying Missouri law); *Cirro Wrecking Co. v. Roppolo*, 605 N.E.2d 544, 553 (Ill. 1992) (citing Restatement (Second) of Judgments § 28(1), which "recognizes an exception to the application of collateral estoppel where the party against whom preclusion is sought was unable, as a matter of law, to appeal the judgment in the initial action").

Recognizing its duty to predict how Illinois' highest court would decide this case, the district court held that, "if the Illinois Supreme Court were to consider the facts of this case, they would not find [that] the inability to appeal barred application of collateral estoppel principles." R.144 at 47. In reaching this conclusion, the district court relied heavily on the Northern District of Illinois' decision in *Thompson v. Mueller*, 976 F. Supp. 762 (N.D. Ill. 1997).

*Thompson* held that the absence of appellate review of a state-court decision finding probable cause to arrest a defendant was insufficient to prevent the application of collateral estoppel in the defendant's subsequent § 1983 action against the arresting officers. In *Thompson*, the district court cabined *Mordican* to the criminal context, and relied upon the acknowledgment of the United States Supreme Court that "the availability of appellate review is not always an essential predicate of collateral estoppel." *Id.* at 766 (citing *Standefer v. United States*, 447 U.S. 10, 23 n.18 (1980)). Mindful that the doctrine of collateral estoppel is concerned primarily with whether "the result achieved in the initial action was substantially correct," the court in *Thompson* focused its inquiry on, whether, under the particular facts of the case before it, application of collateral estoppel would be unfair or unjust. *Id.* The court concluded that Thompson's

inability to appeal did not bar the use of collateral estoppel "because (1) the issue of probable cause was litigated thoroughly in the state court; (2) the judge's decision rested on the credibility determinations of several witnesses; and (3) the possibility of the decision being reversed on appeal was, at best, extremely low." *Id.*

Here, the district court considered that the relevant facts are "practically identical" to the facts in *Thompson*. R.144 at 51. Reasoning that, because the Knox County Court's decision on Teresa's suppression motion rested on credibility determinations that are virtually never overturned on appeal, the result in the initial action was "substantially correct." *Thompson*, 976 F. Supp. at 766. Accordingly, the district court held that Teresa's inability to appeal did not preclude application of collateral estoppel.

We respectfully decline to adopt the reasoning of the district court. In our view, the court erred, both in refusing to extend *Mordican* to the § 1983 context, and in its application of the principles from *Thompson*. *Mordican* cited approvingly language from *People v. Hopkins*, 284 N.E.2d 283, 284 (Ill. 1972), which stressed the limited applicability of collateral estoppel against a criminal defendant. The rationale for this limitation, *Hopkins* explained, is that

> a defendant, unlike the prosecution, is not allowed an immediate appeal from an adverse ruling upon a motion to suppress. He cannot review that ruling until after he has been convicted and sentenced. And for a variety of reasons he might not wish to appeal, or as in the case of an acquittal at the first trial, he might not be able to do so.

*Id.* As this language indicates, the concerns that limit application of collateral estoppel in the criminal context

arise out of problems of appealability for criminal defendants, rather than the nature of subsequent proceedings.

The situation in Teresa's case certainly is no different. She was, at the time of the suppression hearing, a criminal defendant like the defendants in *Mordican* and *Hopkins*. Teresa similarly was limited in her ability to test the correctness of the trial court's ruling through appellate review. Because the problem in *Mordican* was that the criminal defendant could not appeal the initial ruling, we see no reason why *Mordican* would not extend to a criminal defendant, similarly unable to appeal, merely because she protests the use of collateral estoppel against her in a subsequent § 1983 action instead of in a subsequent criminal proceeding. Therefore, it appears highly likely that the Supreme Court of Illinois would extend the rule in *Mordican* to cover situations like Teresa's.[10]

Collateral estoppel is an equitable doctrine. *Jones v. City of Alton*, 757 F.2d 878, 885 (7th Cir. 1985); *Talarico v. Dunlap*, 685 N.E.2d 325, 328 (Ill. 1997). Even when the technical

---

[10] Such an extension would bring Illinois into conformity with other courts that have addressed this issue. Each applied the approach of the Restatement and refused to allow collateral estoppel in a subsequent civil trial against a criminal defendant who had been unable to appeal the initial ruling. *See, e.g., Looney v. City of Wilmington*, 723 F. Supp. 1025, 1033 (D. Del. 1989) (applying Delaware law); *Lombardi v. City of El Cajon*, 117 F.3d 1117, 1121-22 (9th Cir. 1997) (applying California law); *AKAK, Corp. v. Commonwealth*, 567 S.E.2d 589, 639-40 (Va. App. 2002); *see also* Restatement (Second) of Judgments § 28(1) (allowing relitigation of an issue if "the party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action").

conditions of the doctrine are met, collateral estoppel must not be applied to preclude an issue "unless it is clear that no unfairness results to the party being estopped." *Talarico*, 685 N.E.2d at 328. True, the Knox County Court's suppression ruling relied in large part on credibility determinations. These credibility findings flow, however, from a line of circular reasoning. The Knox County Court decided that, because Teresa claimed she was coerced into a false confession, she established a record of lying to public officials and therefore could not be trusted to testify truthfully at the suppression hearing. This logic unfairly counts against a defendant an untruth that the defendant now contends was made because of physical or psychological threats. Indeed, the Knox County Court's reasoning would prohibit, as a practical matter, any involuntary confession from ever being suppressed on the testimony of the defendant, no matter how strong that testimony otherwise might be. If a defendant could not be credited at a suppression hearing due to the admitted falsity of her confession, the officers' version of the events would invariably carry the day. As the Knox County Court pointed out, suppression motions often turn on whether the court believes the officers' or the defendant's account of the events leading to confession. The court, however, set up a credibility analysis that decided the issue before hearing any testimony. In these circumstances, it would be extremely unfair to hold Teresa to the unappealable judgment of a court that used unsound reasoning to resolve credibility. Collateral estoppel therefore cannot bar relitigation of the voluntariness of Teresa's confession.

## 2. The Merits of Teresa's Fifth and Fourteenth Amendment Claims

The facts in the record before us certainly do not establish, as a matter of law, that Teresa's confession was free of police coercion. Threats to a suspect's family or children, even if implicit, certainly may render confessions involuntary for purposes of due process. *See, e.g., Lynumn v. Illinois*, 372 U.S. 528, 533 (1963) (confession coerced when police told a female suspect that she was in jeopardy of losing welfare benefits and custody of her children); *Rogers v. Richmond*, 365 U.S. 534, 543 (1961) (confession coerced when police threatened to take suspect's wife into custody if he did not confess); *Spano v. New York*, 360 U.S. 315, 323 (1959) (confession coerced when officer, a close friend of defendant, told defendant that officer would get in trouble if defendant did not confess). Moreover, the parties vehemently dispute which threats Officers Sheppard and Riley actually made to Teresa and when the officers made those threats. These issues of fact preclude summary judgment.

There are similar issues of fact regarding whether Teresa received *Miranda* warnings before she confessed. The defendants contend, nevertheless, that we must affirm the district court's *Miranda* ruling because of *Chavez v. Martinez*, 538 U.S. 760 (2003), in which the Supreme Court narrowed the availability of the Fifth Amendment as a basis for civil liability.[11] In *Chavez*, the § 1983 plaintiff Martinez had made

---

[11] *Chavez* left open the possibility that a plaintiff could pursue a claim for violation of substantive due process in the event of genuine physical or mental coercion surrounding her confession:

> [A]ny argument for a damages remedy in this case must depend not on its Fifth Amendment feature but upon the
> (continued...)

incriminating statements while in police custody without receiving *Miranda* warnings. He never was prosecuted, but filed a § 1983 action against Chavez, the officer who had questioned him. In that action, Martinez alleged that Chavez violated his Fifth Amendment right to be free from self-incrimination as well as his Fourteenth Amendment substantive due process right to be free from coercive questioning. The Supreme Court, in a plurality opinion, held that the police officer's questioning of Martinez without *Miranda* warnings did not violate his rights under the Self-Incrimination Clause of the Fifth Amendment because his compelled statements had not been used against him in a criminal case. The plurality reasoned that *Miranda* "created prophylactic rules designed to safeguard the core constitutional right protected by the Self-Incrimination Clause," *id.* at 770, namely that "[n]o person . . . shall be compelled *in any criminal case* to be a *witness* against himself," *id.* at 766 (citing, with added emphasis, U.S. Const. amend. V). The phrase "criminal case," as it is employed in the Self-Incrimination Clause, requires, at the very least, the initiation of a legal proceeding, rather than mere police questioning, before a suspect's self-incrimination rights are implicated. *Id.* at 767 ("Statements compelled by police interrogations of

---

[11] (...continued)

> particular charge of outrageous conduct by the police, extending from their initial encounter with Martinez through the questioning by Chavez. That claim, however, if it is to be recognized as a constitutional one that may be raised in an action under § 1983, must sound in substantive due process.

*Chavez v. Martinez*, 538 U.S. 760, 779-80 (2003) (Souter, J., joined by Stevens, Kennedy, Ginsburg & Breyer, JJ.). Teresa's claim that her confession was the result of psychological coercion is therefore unaffected by *Chavez*.

course may not be used against a defendant at trial, . . . but it is not until their use in a criminal case that a violation of the Self-Incrimination Clause occurs.").[12] Martinez never was prosecuted. Consequently, the absence of a criminal case "in which Martinez was compelled to be a 'witness' against himself" defeated his claim for damages based on the Self-Incrimination Clause. *Id.* at 773.

After *Chavez*, therefore, violation of the *Miranda* safe-guards cannot provide the basis for § 1983 liability without use of a suspect's statements against him in a "criminal

---

[12] Two other Justices also rejected the self-incrimination claim, but did so in less absolute terms. They noted a cause of action based on the *Miranda* protections may be available, but only if the Fifth Amendment's "core guarantee, or the judicial capacity to protect it, would be placed at some risk in the absence of such complementary protection." *Chavez v. Martinez*, 538 U.S. 760, 778 (2003) (Souter, J., joined by Breyer, J., concurring). They added that the plaintiff had not made the requisite "powerful showing" needed to come within this exception, especially since he "offer[ed] no limiting principle or reason to foresee a stopping place short of liability in all . . . cases" where *Miranda* was violated. *Id.* at 779. The remaining members of the Court con-tended, in dissent, that the Self- Incrimination Clause "provides both assurance that a person will not be compelled to testify against himself in a criminal proceeding and a continuing right against government conduct intended to bring about self-incrimination. . . . The principle extends to forbid policies which exert official compulsion that might induce a person into forfeiting his rights under the Clause. . . ." *Id.* at 791-92 (Kennedy, J., joined by Stevens & Ginsburg, JJ., dissenting). According to the dissenters, "[t]he conclusion that the Self-Incrimination Clause is not violated until the government seeks to use a statement in some later criminal proceeding strips the Clause of an essential part of its force and meaning." *Id.* at 793.

case." The plurality in *Chavez* declined to define "the precise moment when a 'criminal case' commences." *Id.* at 766 ("[I]t is enough to say that police questioning does not constitute a 'case.' "). At the very least, *Chavez* requires "the initiation of a legal proceeding." *Id.* In the paradigmatic *Miranda* case, the Fifth Amendment is violated when a criminal defendant's *Miranda*-infirm statements are admitted as evidence against him in the prosecution's case-in-chief at criminal trial. Teresa's self-incrimination claim falls short of this paradigm; charges were dropped before her case went to trial. Yet, her "criminal case" advanced significantly farther than did that of the *Chavez* plaintiff, who never had criminal charges filed against him at all. Teresa's statement, by contrast, allowed police to develop probable cause sufficient to charge her and initiate a criminal prosecution. In this fashion, her allegedly un-warned statements were used against her in a way perhaps contemplated by the Self-Incrimination Clause. Teresa's situation, thus, raises the intermediate question left unanswered by *Chavez*: whether a suspect suffers a violation of her right to be free from self-incrimination when her un-warned confession is used to initiate a criminal prosecution against her, but charges are dropped before that confession can ever be introduced at trial.[13]

This court has not directly addressed this issue, and has given mixed indication on the scope of the *Chavez* holding. In *Allison v. Synder*, 332 F.3d 1076, 1080 (7th Cir. 2003), we held that, under *Chavez*, inmates who make un-

---

[13]  As Justice Souter noted in concurrence, "[t]he question whether the absence of *Miranda* warnings may be the basis for a § 1983 action under any circumstances is not before the Court." *Chavez*, 538 U.S. at 779 (Souter, J., concurring).

warned incriminating statements in the course of sex offender group therapy programs have no damages remedy available without evidence that those statements were used against them in a criminal proceeding. In *Allison*, we made no attempt to define the manner in which statements must be used for the self-incrimination right to attach. That the prisoners, like the *Chavez* plaintiff, were never prosecuted based on the un-warned statements was sufficient to deny relief. This court, in another post-*Chavez* opinion, recently noted in dicta:

> We also place little weight on earlier court conclusions that a failure to give *Miranda* warnings cannot support a claim under § 1983. *E.g., Giuffre v. Bissell*, 31 F.3d 1241, 1256 (3d Cir. 1994); *Warren v. City of Lincoln*, 864 F.2d 1436, 1442 (8th Cir. 1989). The latter cases were decided before the Supreme Court determined in *Dickerson v. United States*, 530 U.S. 428, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000), that the *Miranda* warnings themselves have constitutional status. Although a plurality of the Court expressed the opinion that civil remedies continue to be unavailable for *Miranda* violations in *Chavez v. Martinez*, 538 U.S. 760, 123 S. Ct. 1994, 155 L. Ed. 2d 984 (2003), the full Court has never taken that step.

*Jogi v. Voges*, 425 F.3d 367, 385 (7th Cir. 2005). This leaves us with little guidance from our own circuit on whether Teresa has stated a valid claim for damages based on the Self-Incrimination Clause.

There are only two post-*Chavez* cases from other courts of appeals that are closely, but not directly, on point. *See Burrell v. Virginia*, 395 F.3d 508 (4th Cir. 2005); *Renda v. King*, 347 F.3d 550 (3d Cir. 2003). In *Renda*, the police failed to warn a suspect of his *Miranda* rights in the course of custo-

dial interrogation. The resulting statements were then used as a basis for filing criminal charges, which were later dropped. In the ensuing civil rights action, the Third Circuit affirmed summary judgment for the officer defendants, holding that Renda's constitutional right to be free from self-incrimination was not violated. The court recognized that *Chavez* did not compel this conclusion, as it "leaves open the issue of when a statement is used at a criminal proceeding." *Renda*, 347 F.3d at 559. The Third Circuit found itself bound, however, by its pre-*Chavez* holding in *Giuffre v. Bissell*, 31 F.3d 1241 (3d Cir. 1994), which, on materially identical facts, held that an alleged *Miranda* violation is not actionable under § 1983 if the suspect's statements were never introduced against him at trial.

*Burrell*, from the Fourth Circuit, involved a § 1983 claim by a motorist who, at the scene of a car accident, was asked by police to produce documentation of automobile liability insurance for his vehicle. When Burrell refused, citing his Fifth Amendment right against self-incrimination, the police served him with a summons for obstruction of justice. On appeal from the district court's dismissal of the action, the Fourth Circuit held that Burrell's § 1983 suit was precluded by *Chavez v. Martinez*, "regardless of whether the Fifth Amendment would bar admission in court of insurance information produced under compulsion." *Burrell*, 395 F.3d at 512. The court acknowledged that, "[u]nlike in *Chavez*, criminal charges *were* ultimately brought against Burrell." *Id.* (emphasis in original). This distinction did not change the analysis, however. The court read the *Chavez* plurality and Justice Souter's concurrence as limiting the self-incrimination protection to the "*courtroom use* of a criminal defendant's compelled, self-incriminating testimony." *Id.* (citing, with added emphasis, *Chavez*, 538 U.S. at 777 (Souter, J., concurring)). Therefore, *Burrell* holds that a

§ 1983 suit cannot proceed if the compelled testimony was never admitted into evidence in court.

On the facts of Teresa's case, we are satisfied that her un-warned statements were used against her in a "criminal case" and in a manner that implicates the Self-Incrimination Clause. Before charges against Teresa and her husband eventually were dropped, a preliminary hearing was held to determine whether probable cause existed to allow the case against her to go to trial.[14] Teresa's confession was offered by the prosecution to support a determination of probable cause. Her confession was then used to set the amount of bail for Teresa and Scott. *See* R.122 ¶ 132. At a subsequent arraignment on charges stemming from the First Bank robbery, Teresa's confession was once again admitted before she was called upon to plead guilty or not guilty. *See id.* ¶ 134-35; *see generally* 725 ILCS 5/113-1 (describing procedure at arraignment). *Chavez*, of course, did not determine whether pre-trial proceedings such as these fall within the scope of a "criminal case" for purposes of the Self-Incrimination Clause. We know only that, under *Chavez*, a criminal prosecution must at least be initiated to implicate a suspect's right against self-incrimination. We are also conscious of language in *Chavez* suggesting that the Fifth Amendment is, at bottom, a trial protection. Yet, where, as here, a suspect's criminal prosecution was not only initiated, but was

---

[14] Illinois law requires a probable cause determination to be made in every felony case before the accused felon may be brought to trial. That probable cause determination may be made either by a judge conducting a preliminary hearing or by a grand jury. *See* 725 ILCS 5/109-3 (preliminary hearing); 725 ILCS 5/112-4 (grand jury); *see generally People v. Mennenga*, 551 N.E.2d 1386, 1390-91 (Ill. App. 1990).

commenced *because* of her allegedly un-warned confession, the "criminal case" contemplated by the Self-Incrimination Clause has begun. That Teresa's confession was then introduced as evidence of her guilt at a probable cause hearing, a bail hearing and an arraignment proceeding further persuades us that Teresa was "compelled in [a] criminal case to be a witness against [her]self." U.S. Const. amend. V.[15] This use of Teresa's confession, if the confession is indeed found to have been elicited without *Miranda* warnings, allows a suit for damages under § 1983.[16]

---

[15] Other Supreme Court precedent confirms that the right to be free from self-incrimination may attach at pre-trial stages of the criminal prosecution. *See, e.g., Michigan v. Tucker,* 417 U.S. 433, 440 (1974) ("Although the constitutional language in which the privilege is cast might be construed to apply only to situations in which the prosecution seeks to call a defendant to testify against himself at his criminal trial, its application has not been so limited."); *Kastigar v. United States*, 406 U.S. 441, 453 (1972) (noting that the Fifth Amendment privilege's "sole concern is to afford protection against being forced to give testimony leading to the infliction of penalties affixed to . . . criminal acts"); *see also Lefkowitz v. Turley*, 414 U.S. 70, 84 (1973) (stating that the Fifth Amendment privilege allows one "not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings") (emphasis added). We, therefore, refuse to hold that the right against self-incrimination cannot be violated unless a confession is introduced in the prosecution's case-in-chief at trial before the ultimate finder of fact.

[16] Additionally, we note that Teresa's confession was used against her in a second criminal proceeding after the charges of bank robbery were dropped. On the day that the Sornbergers were released from jail, state's attorney Mangieri charged Teresa with

(continued...)

We do not see conflict between our holding today and that of our sister circuit in *Burrell*. There, Burrell claimed that his constitutional rights were violated when the police issued him an obstruction of justice summons for invoking his right to remain silent. The Fourth Circuit held that the issuance of a summons was not a "*courtroom use* of a criminal defendant's compelled, self-incriminating testimony," and therefore Burrell failed to state a claim under § 1983 for violation of his right against self-incrimination. *Burrell*, 395 F.3d at 513 (emphasis in original). Here, by contrast, Teresa's confession was used at a preliminary hearing to find probable cause to indict, to arraign and to set her bail. More than the mere issuance of a summons, failure to administer Teresa *Miranda* warnings led to three distinct "courtroom uses" of her un-warned statements. Assuming the predicate *Miranda* violation, she has been compelled to bear witness against herself.

## D. Concealment of Exculpatory Evidence

The Sornbergers' complaint further alleged that the defendants violated the Sornbergers' rights to due pro-

---

[16] (...continued)
obstruction of justice for making a false confession. Mangieri threatened to try Teresa on the bank robbery charge unless she pleaded guilty to obstruction. Teresa complied and was sentenced to time served; she had already spent 118 days in jail awaiting trial for bank robbery. Although this plea and sentence were later vacated, the proceeding in which Teresa entered her guilty plea certainly qualifies as a use of her allegedly coerced confession in a criminal case. Accordingly, this alternative use of Teresa's confession supports a claim for damages under the Fifth Amendment.

cess by generating a police report that falsely described the circumstances surrounding Teresa's confession, by lying to the state prosecutor about the confession, and by perjuring themselves at the suppression hearing. The complaint also alleged that the officers violated Scott's right to due process by withholding facts from the state's attorney that cast doubt on the probability that Scott committed the robbery.

The district court held that this claim failed because (1) Teresa's confession was deemed voluntary by the Knox County Court; and (2) the facts supporting Scott's innocence, even if disclosed, would not have disturbed the finding of probable cause. Thus, in the district court's view, the alleged violations lacked any causal relationship to the Sornbergers' prolonged detention. We shall now examine this claim in more detail. The Sornbergers' complaint alleged that Officers Sheppard and Riley failed to disclose the coercive circumstances surrounding Teresa's confession, both in the police report filed by the officers and in their testimony at the suppression hearing. Considering itself bound by the facts established by the Knox County suppression proceeding, the district court determined that the officers' police report and testimony could not be false. Accordingly, in the district court's view, the evidence did not establish the causation element necessary to proving the constitutional torts alleged by Teresa. As we already have concluded, the findings of the Knox County court are not entitled to preclusive effect, and the circumstances surrounding Teresa's confession may indeed have violated her Fifth and Fourteenth Amendment rights. We must address, therefore, whether Teresa has stated an otherwise valid claim of unconstitutional concealment.

Because the allegations involve active concealment and failure to disclose on the part of Officers Sheppard and

Riley, we must treat Teresa's due process claim as one predicated on *Brady v. Maryland*, 373 U.S. 83, 87 (1963).[17] Such a claim is viable when the prosecution or police fails to disclose exculpatory evidence to a criminal defendant before trial. *See Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003).

The failure of Officers Sheppard and Riley to disclose the coercive circumstances of Teresa's confession does not, however, state a viable *Brady* claim. Our decision in *Gauger* controls such a situation. In that case, Gauger sued three detectives under § 1983 for allegedly giving the prosecution a false account of Gauger's interrogation. The court found Gauger's "proposed extension of *Brady* difficult even to understand." *Id.* The court explained:

---

[17] In the Sornbergers' summary judgment briefing, they term the officers' concealment of evidence a due process violation. The Sornbergers do not further articulate the specific due process right being invoked. Nor does the Sornbergers' appellate brief provide any illumination, as it focuses on showing why the district court was wrong to dismiss the predicate coerced confession claim. The Sornbergers' complaint also alleged that the officers perjured themselves at the suppression hearing. Of course, were Teresa claiming damages solely based upon the officers' perjured testimony, the officers would be entitled to absolute immunity. *See Briscoe v. LaHue*, 460 U.S. 325 (1983); *Buckley v. Fitzsimons*, 20 F.3d 789 (7th Cir. 1994). However, Teresa also argues that the officers withheld exculpatory information and lied to the prosecutor who successfully indicted her and Scott. "Neither the withholding of exculpatory information nor the initiation of constitutionally infirm proceedings is protected by absolute immunity." *Ineco v. City of Chicago*, 286 F.3d 994, 1000 (7th Cir. 2002). The fact that Teresa also complained of perjury does not foreclose her *Brady* claim.

It implies that the state has a duty not merely to disclose but also to create truthful exculpatory evidence. Indeed the duty to disclose falls out, because Gauger knew what he had said at the interrogation. The problem was not that evidence useful to him was being concealed; the problem was that the detectives were giving false evidence. Gauger wants to make every false statement by a prosecution witness the basis for a civil rights suit, on the theory that by failing to correct the statement the prosecution deprived the defendant of *Brady* material, that is, the correction itself.

*Id.* (citations omitted). Here, Teresa complains that Officers Sheppard and Riley failed to disclose the circumstances of her interrogation. However, Teresa already was quite familiar with those circumstances. Teresa knew herself what occurred during the interrogation, and the police were under no *Brady* obligation to tell her again that they coerced her into confessing.

Nor can *Brady* serve as the basis of a cause of action against the officers for failing to disclose these circumstances to the prosecutor. *Brady* rights run to the criminal defendant, not to the prosecution. The Constitution does not require that police testify *truthfully*; rather "the constitutional rule is that the defendant is entitled to a trial that will enable jurors to determine where the truth lies." *Buie v. McAdory*, 341 F.3d 623, 625-26 (7th Cir. 2003). Teresa was not deprived of evidence held by the police or prosecutor that would have helped her question the officers' version of the events in court. She therefore has not stated a valid *Brady* claim.

**E. Municipal Liability**

The district court dismissed the City of Galesburg as a defendant. It held that the City could not be liable under a theory of respondeat superior, absent a predicate constitutional violation by one of its agents. Because we have determined that Officers Sheppard and Riley may be found liable for Teresa's unlawful arrest and coerced confession, we must determine whether the City of Galesburg is subject to municipal liability for the conduct of its officers.

Under *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978), municipalities and other local government units are "among those persons to whom § 1983 applies." *Monell*, however, places a *substantial* limitation on this liability. A municipality "cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Id.* at 691. Rather, municipal governments may be sued only when their officers inflict an injury in the execution of the government's policy or custom, "whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* at 694.

The Sornbergers do not point to any express Galesburg policy that Sheppard and Riley were enforcing when they violated Teresa's constitutional rights. Instead, the Sornbergers attempt to show that Sheppard and Riley's actions were part of a "wide-spread practice that although not authorized by written law and express policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005) (internal quotation marks omitted).

Establishing *Monell* liability based on evidence of inadequate training or supervision requires proof of "deliberate

indifference" on the part of the local government. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Robles v. City of Fort Wayne*, 113 F.3d 732, 735 (7th Cir. 1997) (requiring deliberate indifference for a finding of municipal liability under § 1983). This proof can take the form of either (1) failure to provide adequate training in light of foreseeable consequences; or (2) failure to act in response to repeated complaints of constitutional violations by its officers. *Id.* at 390 & n.10; *see also, e.g., Robles*, 113 F.3d at 735 (indicating that failure to act after learning of pattern of violations would be deliberately indifferent).

Here, Teresa's proferred evidence suffices to create triable issues with respect to both forms of deliberate indifference. Teresa first cites evidence that Galesburg had a policy of coercing confessions out of female suspects by threatening to have DCFS take away their children. For support, Teresa offers the deposition testimony of criminologist Paul Palumbo, who "reviewed the [Galesburg Police Department's] practices and policies and created an expert report." R.122 ¶ 152. Palumbo concluded, based on his review of complaints lodged against Galesburg, that the Galesburg Police Department "has been deliberately indifferent to a pattern of use of coercive threats, including threats to misuse DCFS, by its officers." *Id.* ¶ 155.F. Teresa also relies upon the deposition testimony of Officer Riley in which he admits that, in his understanding, telling a person in Teresa's situation, "you need to come with me to the police department" is consistent with "policies and practices of the Galesburg police department." *Id.*, Ex.38 at 141. This evidence gives rise to triable issues with respect to Galesburg's municipal liability on theories of both failure to train and refusing to correct complained-of behavior. On this record, summary judgment dismissing the City of Galesburg was therefore improper.

**F.  The Sornbergers' Children's Claims of Intentional Infliction of Emotional Distress**

The district court dismissed the Sornbergers' pendant state law claim for intentional infliction of emotional distress brought on behalf of their children. The court held that the Sornbergers had not offered any evidence that the children suffered the "severe emotional distress" needed to make out their claim under Illinois law. The district court considered the affidavits from family, educators and the children themselves, and concluded that the "drop in grades and poor attitude" described in those affidavits could not amount to severe emotional distress. R.144 at 55.

The tort of intentional infliction of emotional distress requires proof of four elements: (1) extreme and outrageous conduct; (2) intent or recklessness to cause emotional distress; (3) severe or extreme emotional distress suffered by the plaintiff; and (4) actual and proximate causation of the emotional distress by defendant's outrageous conduct. *See Pub. Fin. Corp. v. Davis*, 360 N.E.2d 765, 767-68 (Ill. 1976). This case does not present an occasion to explore all of these requirements in depth. It is sufficient to note that, in Illinois, "emotional distress alone is not sufficient to give rise to a cause of action. The emotional distress must be severe." *Id.* at 767. Although perhaps caused by their parents' wrongful incarceration, the Sornbergers' children's drop in grades and attitude problems are not evidence of the type of severe distress, unendurable by a reasonable person, that is actionable under Illinois law. *See Kleidon v. Rizza Chevrolet, Inc.*, 527 N.E.2d 374, 377 (Ill. App. Ct. 1988) ("Although fright, horror, grief, shame, humiliation, worry, etc. may fall within the ambit of the term 'emotional distress,' these mental conditions alone are not actionable.").

We therefore see no infirmity in the judgment of the district court. Its decision granting summary judgment on the children's claims was correct.

**Conclusion**

For the foregoing reasons, we affirm in part and reverse and remand in part the judgment of the district court. We affirm the judgment of the district court with respect to the Sornbergers' concealment of evidence claim and the children's claims for intentional infliction of emotional distress. With respect to Scott's claim for unlawful arrest, we affirm the district court's determination that Officers Sheppard and Riley cannot be found liable, but we reverse the entry of summary judgment in favor of Chief Pesci and Officer Clauge. Regarding Teresa's claim for false arrest, we affirm the determination of the district court that neither Chief Pesci nor Officer Clauge may be held liable, but we reverse and remand with respect to Officers Sheppard and Riley. On Teresa's claims related to her involuntary confession, we reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion. We also reverse and remand the district court's determination that Galesburg could not be found liable on a theory of municipal liability for Teresa's claims. We also direct that on remand this case be reassigned to a different judge. *See* 7th Cir. R. 36. The parties shall bear their own costs in this court.

AFFIRMED in part,
REVERSED and REMANDED in part

A true Copy:

     Teste:

                          _____
                          *Clerk of the United States Court of*
                            *Appeals for the Seventh Circuit*